UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACKSON LEWIS LLP
One North Broadway
White Plains, New York 10601
Attorneys of Record for Defendants Mays and Scott
      Scott T. Baken (SB 9631)
      Matthew H. Woodward (MW 7177)

---

KIMBERLY OSORIO and MICHELLE JOYCE,

                         Plaintiffs,

          -against-

SOURCE ENTERPRISES, INC.;
DAVID MAYS, in his official and individual
Capacities; and RAYMOND SCOTT, also known
as "BENZINO," in his official and individual
capacities,

                         Defendants.

Civ. No.: 05 CV 10029 (JSR)

---

## DEFENDANTS DAVID MAYS AND RAYMOND SCOTT'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

      Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1 of this

Court, Defendants David Mays and Raymond Scott (hereinafter "Defendants"), by their

undersigned attorneys, respectfully submits this Statement Of Material Facts As To Which There

Is No Genuine Issue To Be Tried.[1]

1.      The Source is the premier magazine in the country devoted to Hip Hop music, culture

      and politics.  (Miller Affidavit ¶ 3).

---

[1] Copies of the pages of the deposition transcripts referenced herein are attached to the accompanying Affidavit of Scott T. Baken, Esq. ("Baken Aff."). References to deposition pages are abbreviated as follows. (1) Plaintiff Kimberly Osorio (KO Tr. __); (2) Plaintiff Michelle Joyce (MJ Tr. __); (3) Defendant David Mays (DM Tr. __); (4). Defendant Raymond Scott (RS Tr. __); (5) Julie Als (JA Tr. __); (6) Jeremy Miller (JM Tr. __); (7) Leroy Peeples (LP Tr. __); (8) Dale Johnson (DJ Tr. __); and (9) Katherine Schad (KS Tr. __). Copies of the Exhibits referenced herein are attached to the Baken Affidavit. Exhibits used during depositions are identified by the name of the deponent and the deposition exhibit number. Defendants have included certain allegations made by Plaintiffs in this Statement for the purpose of demonstrating that, even if the allegations are assumed to be true, Defendants are

2.      The goal and vision of the Source is to reflect the greatness of Hip Hop in all of its forms, and to expose some of its ugliness as well, in a manner and context that will appeal to its readership. (Miller Affidavit ¶ 3).

3.      At all times relevant hereto, Defendant Source Enterprises, Inc. employed nine officers, four of whom were females: Editor in Chief Kimberly Osorio, Director of Human Resources Julie Als, Tracii MacGregor and Photo Director Katherine Schad.

4.      Defendant Source Enterprises, Inc.'s male officers were Chief Executive Officer David Mays, Chief Brand Officer Raymond Scott, Chief Operating Officer Jeremy Miller, Chief Financial Officer Ron Lefkon and Publisher Christopher White.

5.      Mr. White's job duties as Publisher and Mr. Miller's job duties as Chief Operating Officer were vastly different than the job duties Plaintiff Osorio performed as the Editor in Chief of the Source. (Miller Affidavit ¶¶ 8, 9).

6.      Prior to her employment with the Source, Plaintiff Osorio obtained a Bachelor of Arts degree in 1995 from Fordham University. (KO Tr. 10).

7.      Thereafter Plaintiff Osorio attended New York Law School and took employment law classes where she studied sexual harassment and discrimination. (KO Tr. 11).

8.      Four years later, Plaintiff Osorio graduated from law school in 1999. (KO Tr. 11).

9.      Plaintiff Osorio began working in the Hip Hop industry in the early 1990s. (KO Tr. 38).

10.      Plaintiff Osorio has appeared on radio programs, given television interviews and written articles about the Hip Hop industry. (KO Tr. 82).

11.      In fact, Plaintiff Osorio is a self proclaimed Hip Hop expert. (KO Tr. 83)

---

entitled to summary judgment dismissing Plaintiffs' claims as a matter of law. If Defendants' motion is not granted in full, Defendants reserve their rights to challenge Plaintiffs' allegations at trial.

12.    During her employment in the Hip Hop industry, Plaintiff Osorio has listened to uncensored hip hop music to provide editorial comments. (KO Tr. 116).

13.    When Plaintiff Osorio heard Hip Hop songs where women are described as "bitches" or "hoes" she has not been offended in her professional capacity and has maintained a level of objectivity. (KO Tr. 50).

14.    Moreover, Plaintiff Osorio is not offended with profanity in lyrics when it is used as a "term of endearment" and not directed at a particular person. (KO Tr. 57).

15.    Plaintiff Osorio uses profanity in the workplace when reciting hip hop lyrics. (KO Tr. 61).

16.    With respect to images of women, Plaintiff Osorio does not feel scantily clad women (i.e., in bikinis, lingerie, etc.) who are voluntarily modeling are being objectified in Hip Hop or non-urban publications. (KO Tr. 70, 75, 76).

17.    Plaintiff began to work for the Source in January 18, 2000 when she was hired as an Associate Music Editor with an annual salary of $45,000. (KO Tr. 132; KO Exhibit 3 Bate Stamped 3205).

18.    Six months thereafter, Plaintiff Osorio received a $5,000 increase in her salary as promised by her immediate supervisor the Editor-in-Chief Carlito Rodriguez. (KO Tr.; KO Exhibit 4 Bate Stamped 3207).

19.    A year later, on or about October 19, 2001, Plaintiff Osorio was elevated to Music Editor and received a $10,000 increase to $65,000 annually and a $365 monthly parking allowance. (Osorio Exhibit 5 Bate Stamp 3211).

20.    At the time of her elevation Osorio was the Source's first female Music Editor. (Osorio Tr. 149-151).

21.    Plaintiff Osorio received a monthly parking allowance until her employment was terminated.  (KO Tr. 373).

22.    On or about March 19, 2002, Defendants Mays and Scott elevated Plaintiff Osorio to Executive Editor and gave her a 50% increase in salary to $100,000 annually. (Osorio Exhibit 6 Bate Stamped 3213).

23.    Six months later, Defendant Mays increased Plaintiff Osorio's annual salary to 115,000.  (Osorio Exhibit 8 Bate Stamp 3215).

24.    During her tenure as Executive Editor of the magazine, Plaintiff Osorio created the Top 100 Kimmy O lyrics including a section on sex.  (KO Tr. 153; Osorio Exhibit 7 Bate Stamp 8905).

25.    In preparing the list, Plaintiff Osorio held various lengthy meetings to build a consensus amongst her staff.  (KO Tr. 154).

26.    None of the lyrics found in these lists offended Plaintiff Osorio.  (Osorio Tr. at 156).

27.    On November 11, 2002, Defendants Mays and Scott promoted Plaintiff Osorio to the position of Editor in Chief of the Source and increased her annual salary to $130,000. (Osorio Exhibit 9 Bate Stamp 3217).

28.    Plaintiff Osorio became the first female Editor in Chief in Source's history (KO Tr. 176).

29.    Christopher White and Damson Allah were also elevated in steps during their employment.  (Mays Tr. 149) (Jeremy Miller Affidavit).

30.     Allah served as an Executive Editor before his ascension to Editor in Chief.  (Miller Affidavit).

31.    Christopher White started as an ad salesperson was elevated to Advertising Director where he remained for a number of years.  (JM Tr. 149).

32.   Following his good performance as an advertising director, Mr. White was then promoted to Publisher and VP of Sales. (DM Tr. 149).

33.   With her salary as Editor in Chief, Plaintiff Osorio was earning more money than her immediate predecessor Carlito Rodriguez. (KO Tr. 176).

34.   Defendants Mays and Scott could have sought eligible candidates outside the source for the position but instead elevated Osorio. (KO Tr. 147).

35.   As Editor-in-Chief, Plaintiff Osorio attended many conferences and appeared on television shows discussing the Hip Hop industry. (KO Tr. 272).

36.   During her employment she also received a down payment for her car in February 2004 a diamond gold bracelet valued at $3,000 and a leather jacket. (RS Tr. 54-56; SE 11186; KO Tr. 429).

37.   Aside from material benefits, Osorio traveled first class and was permitted to bring her young daughter to the office several times a week during her tenure as Editor in Chief. (KO Tr. 176, 238-239).

38.   Jeremy Miller, the Source COO, authorized Plaintiff Osorio to expense clothing for company events. (KO Tr. 374; JM Tr. at 252).

39.   In fact, Plaintiff Osorio made one clothing purchase and was reimbursed for it in 2004. (SE 11194).

40.   Although her salary had nearly tripled in the two and a half years she was at the Source, Plaintiff Osorio complained about her salary during the time she held the Executive Editor and Editor in Chief positions. (KO Tr. 166-167).

41.   When doing so, she did not specify this was gender related. (KO Tr. 168, 184).

42.   Plaintiff Osorio also failed to mention the two Source employees she compares herself to, Chris White and Jeremy Miller. (KO Tr. 183).

43. In fact, Plaintiff Osorio had no knowledge of what anyone else earned while employed at the Source and her belief that White and Miller earned greater salaries than her was based on rumor. (KO Tr. 192, 200).

44. Moreover, Plaintiff Osorio has no basis for comparison to how she was treated as Editor-in-Chief because she is uncertain how her predecessor Carlito Rodriguez was treated during his tenure. (KO Tr. 143).

45. Plaintiff Osorio's ignorance is based on the fact she was not privy to conversations between him, Dave Mays and Ray Scott. (KO Tr. 143).

46. Furthermore, Plaintiff Osorio's belief that Defendants Mays and Scott treated her differently than the other Editors in Chief was based on opinion and not facts. (KO Tr. 384, 385).

47. Plaintiff Osorio identifies a group of employees that were rumored to have received allowances during their employment at the Source as Dale Johnson, Leroy Peeples, Eric Brown, and Christopher White. (KO Tr. 367, 368, 369, 370 & 371; Miller Exhibit 1 Bate Stamped SE 2960, 2863, 2874 & 2938)

48. None of these individuals are similarly situated to Osorio as she only compares herself to White and Miller. (KO Tr. 183).

49. Furthermore, Plaintiff Osorio admits Dale Johnson is not a comparator. (KO Tr. 179).

50. As part of her gender discrimination claim, Osorio is under the mistaken belief the Source barber only cut male employees' hair. (Osorio Tr. 278-280).

51. However women received trims from the barber. including Julie Als. (Als Tr. 435).

52. Plaintiff Osorio makes several allegations in support of her sexual harassment claim.

53.    With respect to Defendant Scott, Plaintiff Osorio alleges he telephoned her repeatedly over one weekend to ask her to go to Atlantic City in 2004, made one isolated comment to the effect of "I like it when your thong is showing" at some point during her tenure as Editor-in-Chief when she was dressed such that her underwear could be seen, asked her questions about her sex life and talked to her about sex "all the time" in 2003, including reporting to her about relationships he had as an attempt to get Osorio to discuss her own personal life.  (KO Tr. 203, 205, 208-09, 214-15).

54.    Plaintiff Osorio alleges Defendant Scott spoke to her about his own relationships more than five times.  (KO Tr. 222-23).

55.    Plaintiff Osorio alleges Defendant Scott referred to them as the king and queen of The Source when asking her to go to Atlantic City.  (KO Tr. 207).

56.    Plaintiff Osorio alleges Defendant Scott questioned her judgment and accused her of having sex with staff members, specifically asking her in 2002 or 2003 in front of Defendant Mays whether she was "fucking" Jermaine Hall.  (KO Tr. 203, 219-220).

57.    Plaintiff Osorio did not complain to Human Resources about Defendant Scott's telephone calls and thong comment, although she knew of no one who was fired for complaining to Human Resources about him.  (KO Tr. 378).

58.    In further support of her claims, Plaintiff Osorio alleges Defendant Mays asked her about a purported intimate relationship with the Hip Hop rapper named Nas in front of Jeremy Miller between December 2002 and January 2003.  (KO Tr. 224-226).

59.    Plaintiff Osorio further alleges she knew Defendants Mays and Scott never asked men questions about their sex life because male employees never told her otherwise.  (KO Tr. 233).

60.   However, Plaintiff Osorio did not have conversations with every male employee who has ever worked at the Source to corroborate her belief.  (KO Tr. 233).

61.   Plaintiff Osorio also alleges Dale Johnson, Defendants Mays' and Scott's Executive Assistant, asked her to dinner throughout the time she worked at the Source from 2000 to 2005.  (KO Tr. 237).

62.   Plaintiff Osorio alleges Mr. Johnson made comments about the way she looked, although she could not recall the specific time frame.  (KO Tr. 246-47).

63.   Plaintiff Osorio never made any written complaints about Mr. Johnson to Human Resources.  (KO Tr. 249).

64.   In fact, Plaintiff Osorio did not complain to Human Resources about Mr. Johnson's alleged comments.  (KO Tr. 395).

65.   During the time when her daughter was a toddler, Plaintiff Osorio brought her to the office.  (KO Tr. 238).

66.   Plaintiff Osorio had a bin of toys and little art center at the Source for her daughter to play with during her visits.  (KO Tr. 242, 243; Osorio Exhibit 10 Bate Stamped 3203).

67.   On at least two separate occasions, Mr. Johnson took Plaintiff Osorio's daughter for an unsupervised trip to a local toy store.  (KO Tr. 239-240).

68.   Plaintiff Osorio further alleges when employee Curtis Williams asked her out on one date in 2004 she was subjected to sexual harassment.  (KO Tr. 251, 396).

69.   Plaintiff Osorio never complained about the invitation nor did she raise any formal objections to the one time he allegedly rubbed her neck.  (KO Tr. 252, 253, 397, 398).

70.   Moreover, Plaintiff Osorio alleges there were pictures of women on the wall with G-strings in Leroy Peeple's and Scott's offices from 2002 to 2005.  (KO Tr. 403).

71.  Plaintiff Osorio never complained to anyone about these pictures. (KO Tr. 402).

72.  Plaintiff Osorio includes in her harassment claim allegations of harassing conduct directed at other women, almost all of which occurred outside her presence.

73.  Plaintiff Osorio alleges Miranda Jane informed her about a comment purportedly offensive comment made by Defendant Scott in or about 2003, but Plaintiff Osorio did not witness the alleged comment. (KO Tr. 255-256, 259).

74.  Plaintiff Osorio alleges she "heard about" Mr. Johnson telling Janique Burke she should "get with him", i.e., have sex, but Plaintiff did not observe this personally. (KO Tr. 255-256).

75.  Plaintiff Osorio could not recall when this occurred, although she later testified she thought "it had to be" 2003. (KO Tr. 259, 416).

76.  Plaintiff Osorio did not complain to Human Resources about this. (KO Tr. 418).

77.  Plaintiff Osorio alleges she saw Mr. Johnson & Siobbon O'Connor interacting, but she could not hear what was said; however, someone told her afterward that Mr. Johnson had man an inappropriate comment. (KO Tr. 256-257).

78.  Plaintiff Osorio alleges this occurred "maybe" in 2003 or 2004. (KO Tr. 258-259).

79.  Plaintiff Osorio did not complain to Human Resources about this. (KO Tr. 416).

80.  Plaintiff Osorio also recalls Plaintiff Joyce telling her something about Alvin Chiles making a comment pertaining to a lollipop in 2004, although Plaintiff Osorio was not present for the comment. (KO Tr. 260).

81.  Plaintiff Osorio did not know about these issues when she worked at the Source. (KO Tr. 260, 422-423).

82.  Moreover, Plaintiff Osorio is not sure when she learned of these issues; it could have been after her employment was terminated. (KO Tr. 417-418).

83. Plaintiff Osorio did not complain to Human Resources about this. (KO Tr. 422).

84. Plaintiff Osorio further alleges she learned <u>after</u> she had left the employ of the Source that two women, Sabrina Smith and Shana McClary, claimed they were sexually harassed; she learned this by reading affidavits. (KO Tr. 260).

85. Plaintiff Osorio did not know about these issues when she worked at the Source. (KO Tr. 260, 422-423).

86. Plaintiff Osorio alleges she learned about a sexual harassment suit that had been brought by Janene Outlaw before Plaintiff Osorio was employed by the Source. (KO Tr. 260).

87. Plaintiff Osorio heard about the lawsuit through another employee and by seeing it referred to it in an article about the Source, although she was not aware of the details. (KO Tr. 331).

88. Plaintiff Osorio alleges Defendant Scott sexually harassed Fashion Assistant Lyani Powers, but learned of this from other employees and did not witness Defendant Scott's interactions with Ms. Powers. (KO Tr. 331-332).

89. To Plaintiff Osorio's knowledge, Ms. Powers never filed a complaint of sexual harassment. (KO Tr. 331-333).

90. The only co-worker Plaintiff Osorio alleges to have personally witnessed being "sexually harassed" is Adila Francis.

91. Specifically Plaintiff Osorio alleges she saw Defendant Scott grab and touch Ms. Frances, and saw Ms. Francis pull away. (KO Tr. 257, 406).

92. Plaintiff Osorio alleges she witnessed Defendant Scott calling Ms. Francis numerous times on the telephone. (KO Tr. 257, 406).

93. Plaintiff Osorio alleges she observed this behavior beginning in 2003. (KO Tr. 407).

94. Plaintiff Osorio alleges she observed Ms. Francis hiding in other people's offices, and Ms. Francis told her to avoid Defendant Scott. (KO Tr. 257, 409-411).

95. Plaintiff Osorio alleges Defendant Scott sent other people to look for Ms. Francis and fined one employee who would not find her, although this alleged reason for her termination was just a rumor. (KO Tr. 257-258).

96. Plaintiff Osorio alleges she observed Ms. Francis crying on one occasion in 2004 over concerns about her job and Defendant Scott's attention toward her. (KO Tr. 412-413).

97. Plaintiff Osorio alleges she complained to Human Resources about how Defendant Scott treated Ms. Francis on one occasion in or about 2004. (KO Tr. 408, 413-414).

98. During the time Plaintiff Osorio was Editor-in-Chief Mays and Scott raised concerns about the content of the magazine. (KO Tr. 235).

99. Plaintiff Osorio disagreed with many of the decisions Defendants Mays and Scott made on behalf of the magazine, although she understood them to be in charge of its direction. (KO Tr. 236).

100. Plaintiff Osorio admits Defendants Mays and Scott criticized her work performance. (KO Tr. 236).

101. Jeremy Miller also criticized various aspects of Plaintiff's job performance, including her consistent failure to meet deadlines. (Osorio Exhibits 14, 15).

102. In early 2005, Defendant Mays also questioned Plaintiff Osorio's creativity. (KO Tr. 293).

103. This led Plaintiff Osorio to print out her weekly reports from September 2003 through December 2004 in the middle of the night on February 10, 2005, before she made her only written complaint concerning alleged gender discrimination on or about

11

February 23, 2005.  (KO Tr. 291, 293; Osorio Exhibit 13 Bate Stamped SE 3225; Osorio Exhibit 17 Bate Stamped PL 1-184).

104.   On or about February 10, 2005, Plaintiff Osorio wrote a memorandum detailing the concerns Defendant Mays had expressed to her about her job performances.  (Osorio Exhibit16 Exhibit PL 00046-00047, Osorio Exhibit 17 PL 00001 & PL00002).

105.   The sole factual basis for Plaintiff Osorio's retaliation claim is the e-mail she sent to Director of Human Resources Julie Als on February 23, 2005 and her subsequent termination from the Source.  (KO Tr. 330, 331; Osorio Exhibit 13 Bate Stamped SE 3225).

106.   In this two-sentence e-mail, Plaintiff Osorio simply stated "As the head of human resources, I am informing you that I have been discriminated against on the basis of my gender."  (KO Tr. 330, 331; Osorio Exhibit 13 Bate Stamped SE 3225).

107.   In response to this e-mail, Ms. Als wrote back "we must discuss the issue in detail." (KO Tr. 330, 331; Osorio Exhibit 13 Bate Stamped SE 3225).

108.   When Ms. Als and Plaintiff Osorio met to discuss the allegation, Plaintiff Osorio refused to participate and claimed she was uncomfortable talking with Ms. Als without legal representation.  (KO Tr. 311, 448).

109.   When the attorney for the Source met with Plaintiff Osorio, she also refused to provide any details of the discrimination claim.  (KO Tr. 312).

110.   Plaintiff Osorio's employment was terminated because of her inability to manage her job, insubordination, ineffectiveness, poor leadership, failure to meet deadlines and failure to withdraw allegations for which she refused to provide evidence or substantiation.  (DM Tr. 158-180; Osorio Exhibits 14, 15, 16, 17 PL00001 & PL00002).

111.   The factual basis for Plaintiff Osorio's defamation claim as set forth in Plaintiffs' Amended Complaint, and the only document that exists in support of this claim, is an AllHipHop.com article.  (KO Tr. 326, 327; Osorio Exhibit 18).

112.   Following her separation from The Source, Plaintiff Osorio became the Editorial Director of a magazine called RAW.  (KO Tr. 95).

113.   Plaintiff Osorio describes the focus of RAW magazine is to showcase "notoriously sexy" women for industry exposure.  (KO Tr. 114; Osorio Exhibit 1 page 2 of 4).

114.   As the Editorial Director of RAW, Plaintiff Osorio is responsible to assign articles, edit the content of the magazine and choose pictures for the publication.  (KO Tr. 95, 96).

115.   In the web version of RAW magazine, Plaintiff Osorio does not find the pictures of topless women on the front cover objectionable.  (KO Tr. 108).

116.   Furthermore, Plaintiff Osorio does not find the scantily clad woman sitting on a man's lap on the cover of RAW magazine to be offensive or degrading.  (KO Tr. 100; Osorio Exhibit 1).

117.   Plaintiff Osorio approved this picture for the cover of RAW magazine.  (KO Tr. 101).

118.   Further in the pages of the web version of RAW magazine, Plaintiff Osorio did not find another picture of a model wearing a G-String to be offensive or degrading.  (KO Tr. 105).

119.   Following a recommendation from Dave Mays' girlfriend Hillary Weston, Plaintiff Joyce started her employment with the Source in September of 2003 as a part-time marketing consultant. (MJ Tr. 10, 33, 39, 40).

120.   At the time Plaintiff Joyce was recommendation for employment, she and Weston were friends.  (MJ Tr. 33, 39, 40).

121.   On November 7, 2003, a few months after Ms. Weston recommended Plaintiff Joyce, Dave Mays hired Plaintiff Joyce as a full time Vice President of Marketing with an annual salary of $95,000 to replace Jeff Jones.  (MJ Tr. 34, 265; DM Tr. 199; Miller Exhibit 1 SE 2960).

122.   In addition to her annual starting salary, in or about March 2004 Plaintiff Joyce received a $5,000 bonus.  (MJ Tr. 78).

123.   Plaintiff Joyce was satisfied with the $100,000 she received in salary and bonus for 2004.  (MJ Tr. 157).

124.   Plaintiff Joyce attended weekly department head meetings in which Julie Als, the Source's Director of Human Resources, discussed the Company's employee and management handbooks.  (JA Tr. 108).

125.   As Vice President of Marketing, Plaintiff Joyce was responsible for supervising two male subordinates, Ousmane Sam and Stets Austin.  (MJ Tr. 43).

126.   Ousmane Sam and Stets Austin were friends of Defendants David Mays and Raymond Scott.  (MJ Tr. 46).

127.   Plaintiff Joyce alleges Ousmane Sam and Stets Austin exhibited poor work performance by coming to work late, being absent and ignoring her.  (MJ Tr. 43-44).

128.   Plaintiff Joyce alleges she complained about the job performance of Mr. Sam and Mr. Austin to Defendant Mays, the Director of Human Resources Julie Als, Publisher Christopher White, Chief Operating Officer Jeremy Miller, Chief Financial Officer Ron Lefkon and General Manager Leroy Peeples.  (MJ Tr. 44-45).

129.   However, Plaintiff Joyce admittedly never complained to any member of management that she felt she had been discriminated against because of her gender or sexually harassed, or that her rights had been violated in any way, by the situation she

experienced with Mr. Sam and Mr. Austin.  (MJ Tr. 52, 53, 59, 60, 62, 65, 66, 68, 69, 70, 71, 72)

130.   In addition, Plaintiff Joyce never submitted a formal written complaint to any member of management regarding Mr. Sam and Mr. Austin.  (MJ Tr. 60-61, 68).

131.   The general thrust of Plaintiff Joyce's gender discrimination claim is that women were required to arrive at work on time and perform their job duties, while it seemed to Plaintiff Joyce that certain men were allowed to have more flexible work schedules and lax attitudes.  (MJ Tr. 103, 116).

132.   However, Plaintiff Joyce admits it was not wrong for the Source to require women to do their jobs.  (MJ Tr. 150-152).

133.   Plaintiff Joyce describes a group of her male coworkers as being part of the Boston Crew":   Dale Johnson, Leroy Peeples, Eric Brown, Alvin Childs, Stets Austin, Ousmane Sam, and "Hawk."  (MJ Tr. 48, 49, 57).

134.   In using the phrase "Boston Crew," Plaintiff Joyce is referring to people she believes were Defendant Scott's friends, associates and colleagues from Boston.  (MJ Tr. 49).

135.   Aja Collins, a female associate of Defendant Scott, was also considered by some to be part of the "Boston Crew."  (JM Tr. 259).

136.   Plaintiff Joyce alleges certain male employees smoked marijuana in the Source's offices, while she was not aware of any female employees who engaged in such activity.  (MJ Tr. 59).

137.   Plaintiff Joyce admittedly cannot determine if the lack of marijuana smoking stemmed from any female employee's personal choice.  (MJ Tr. 59).

138.   Plaintiff Joyce alleges she was offered marijuana by a male employee and she declined.  (MJ Tr. 83).

139. Other employees testified they witnessed female employees Tracy McGregor, Betsy Jones and Miranda Jane smoking marijuana at the Source. (JM Tr. 22, 447; DJ Tr. 95-96; KS Tr. 221).

140. Plaintiff Joyce claims several members of the Boston crew received perquisites which she did not receive during her employment – specifically, car and housing allowances. (MJ Tr. 75).

141. Although Plaintiff Joyce does not know what Dale Johnson's job responsibilities were and what hours he worked, she identified him as part of her gender discrimination claim because she claims he received living and car allowances, and earned more salary than she did. (MJ Tr. 75).

142. On February 3, 1997, Defendants Scott and Mays hired Dale Johnson to be their assistant for $30,000 a year and no allowances. (DJ Tr. 19; Miller Exhibit 1 S E 2960).

143. During the course of his employment, Mr. Johnson's duties including answering telephones, filing, confirming meetings, setting up meetings, processing invoices, interacting with artists, filling out paperwork, picking up clients at the airports and dealing with Defendant Mays' and Defendant Scott's personal and family needs. (DJ Tr. 19, 20, 21, 41).

144. Mr. Johnson was on call 24 hours a day in order to be available for work. (DJ Tr. 23, 24).

145. Defendant Johnson believes he received a monthly car allowance of $1081.52 for a period of five years. (DJ Tr. 39).

146. Mr. Johnson received monthly gas, toll and rent allowances of $1,500 for two to three years, ending in 2003 or 2004. (DJ Tr. 43).

147. Mr. Johnson received a monthly amount of $611 for car insurance, but this has stopped. (DJ Tr. 44).

148. From in or about 2000 to the present, Mr. Johnson has received a monthly parking allowance of $365. (DJ Tr. 45).

149. Mr. Johnson has received the following annual salary increases: (1) $30,000 to $55,000 in 1998; (2) $55,000 to $68,000 in 2000; and (3) $68,000 to $85,000 in 2002. (Miller Exhibit 1 SE 2960; DJ Tr. 37).

150. In May of 2006 Mr. Johnson's annual salary was reduced by 20 %. (DJ Tr. 37).

151. Plaintiff Joyce lists General Manager Leroy Peeples as part of her discrimination claim because he purportedly came to the office in the early afternoon smelling like cigarette or marijuana smoke, even though Plaintiff Joyce has no idea what Mr. Peeples' salary and working hours were. (MJ Tr. 79, 80).

152. Plaintiff Joyce claims Mr. Peeples' receipt car and housing allowances contributes to her discrimination claim. (MJ Tr. 79, 98).

153. Mr. Johnson and Mr. Peeples were the only employees whom Plaintiff Joyce claims received discriminatory car and housing allowances. (MJ Tr. 79, 98).

154. Leroy Peeples was hired on June 26, 1998 as an Assistant to the President for $60,000 a year. (Miller Exhibit 1 SE 2863).

155. Mr. Peeples' salary was reduced from $60,000 to $35,000 on or about May 17, 2005. (Miller Exhibit 1 SE 2863 LP Tr. 53, 54).

156. During Mr. Peeples' employment he received monthly allowances of $1,000 for rent and $813 for a car, all of which stopped January 2006. (LP 55, 56; Miller Exhibit 1 SE 2863).

157.   The third Boston crew member Plaintiff Joyce identifies is Eric Brown, whom she claims spent most of his day loafing at his desk. (MJ Tr. 81).

158.   Plaintiff Joyce never complained to any member of management that the treatment accorded to Mr. Brown, Mr. Peeples or Mr. Johnson represented gender discrimination. (MJ Tr. 85).

159.   Plaintiff Joyce also alleges male employees "Boo" (Robert Rosario), "Gotti," and "Tory" were allowed to arrive late for work, even though she did not know their work hours at the office. (MJ Tr. 86, 87, 88, 89).

160.   Moreover Plaintiff Joyce did not complain to anyone about Boo and Gotti and there is no evidence which suggests she complained about Tory. (MJ Tr. 86, 87, 88, 89).

161.   Plaintiff Joyce further alleges her predecessor Jeff Jones is part of her gender claim because he earned more annual salary than she did for less responsibility. (MJ Tr. 267-268).

162.   Plaintiff Joyce holds this belief even though she does no know the number of years Mr. Jones worked at the Source, his related job experience, or his educational background. (MJ Tr. 265-266).

163.   Plaintiff Joyce alleges Mr. Brown, Mr. Peeples, Defendant Scott and Mr. Johnson were watching a pornographic movie in the mailroom of the Source's offices on one isolated occasion during the late afternoon in the summer of 2004. (MJ Tr. 193, 194).

164.   However, Plaintiff Joyce does not know if other women were invited to watch this film and she admittedly did not complaint to anyone about this alleged incident. (MJ Tr. 193, 194).

165.   Plaintiff Joyce alleges there were pictures (a total of less than 15) of women in G-strings displayed on a cork board in the back area of the Source's offices where Mr.

18

Sam, Mr. Austin, Arash, and Terry sat in Peeples' office and Jason's screensaver in the summer of 2004.  (MJ Tr. 130, 152-153, 173-176).

166.   Plaintiff Joyce did submit any written complaints to Human Resources about these purported pictures.  (MJ Tr. 130, 131).

167.   Plaintiff Joyce did not complain about these pictures to Defendant Mays or Defendant Scott.

168.   Plaintiff Joyce never submitted any written complaint to any member of management alleging any form of gender discrimination or sexual harassment during her employment with the Source.  (MJ Tr. 150).

169.   Plaintiff Joyce alleges she verbally complained to Director of Human Resources Julie Als about suggestive pictures on one occasion in the summer of 2004.  (MJ Tr. at 130, 175-76).

170.   Ms. Als did not convey any alleged complaint about suggestive pictures to Defendant Mays or to Defendant Scott.  (JA Tr. 300).

171.   Plaintiff Joyce alleges the pictures in question were taken down when The Source moved its offices in November of 2004.  (MJ Tr. 177, 178).

172.   Plaintiff Joyce alleges Terry (a designer) and Jason put these types of photographs in their cubicles following the Source's move, but she never complained about this.  (MJ Tr. 177, 178).

173.   Aside from the purported pictures, Plaintiff states the basis of her harassment arose from four isolated incidents she had with Alvin Childs.  (MJ Tr. 180, 180, 188-190).

174.   Plaintiff Joyce alleges Mr. Childs said "damn you look good in those jeans" in November or December of 2004.  (MJ Tr. 180).

175. Plaintiff Joyce neither told Mr. Childs to stop the behavior nor did she complain to anyone about this alleged incident. (MJ Tr. 180, 184).

176. At or around the same time, Plaintiff Joyce alleges claims Mr. Childs said "I will give you something to suck on" while she had a lollipop in her mouth. (MJ Tr. 181).

177. Again, Plaintiff Joyce failed to tell Mr. Childs to cease the conduct and never complained to anyone about this alleged incident. (MJ Tr. 186).

178. The third alleged incident regarding Childs purportedly occurred when a photographer asked to take a picture of Plaintiff Joyce and Mr. Childs at a Holiday Party in December 2004. (MJ Tr. 190).

179. Although Plaintiff Joyce concedes she had the opportunity to decline, she chose to participate and let the photographer take the picture, and Childs allegedly wrapped his arms around her and "brushed her butt" but it never came to rest on her backside. (MJ Tr. 190).

180. The final incident allegedly purportedly occurred when Plaintiff Joyce purportedly approached Mr. Childs and asked if he had another candy cane when she observed him give one to another woman, and he replied, "No, I just gave it to her and told her to lick it until the white came out." (MJ Tr. 188).

181. During this brief alleged encounter Plaintiff Joyce never told Mr. Childs to stop, nor did she thereafter complain to anyone. (MJ Tr. 188, 189).

182. Plaintiff Joyce claims she did not report Mr. Childs' alleged conduct to management because she "assumed" something would happen to her. (MJ Tr. 185-186).

183. Plaintiff Joyce knows of no other individual at The Source who complained about Mr. Childs or any member of the Boston Crew and was terminated. (MJ Tr. 186).

184. Aside from the sexual harassment Plaintiff Joyce claims she experienced, she alleges four other women were sexually harassed at the Source:  These women were Adila Francis, Kim Osorio, Tiffany Nelson and Nafisa Saloon.  (MJ Tr. 195).

185. Plaintiff Joyce alleges she observed men hanging around Ms. Nelson's desk and Mr. Peeples rubbing her neck and shoulders.  (MJ Tr. 196).

186. Plaintiff Joyce admits Ms. Nelson told her she was comfortable with this attention and she knew how to handle it.  (MJ Tr. 196).

187. Moreover, Plaintiff Joyce concedes Ms. Nelson never told her this attention was unwelcome, or that she felt harassed in any way.  (MJ Tr. 197).

188. Plaintiff Joyce's believed Ms. Nelson was having an affair with Mr. Peeples based on a rumor she heard, and has no idea if the purported relationship was consensual.  (MJ 196, 200, 201).

189. Plaintiff Joyce's belief that Adila Francis was subjected to sexual harassment is based on one alleged event in 2004 when Ms. Francis came into Joyce's office to avoid someone.  (MJ Tr. 201, 202).

190. During this purported incident, Ms. Francis never told Joyce whom she was running from.  (MJ 202, 203).

191. Plaintiff Joyce heard from other people Ms. Francis was avoiding Defendant Scott.  (MJ 202, 203).

192. Plaintiff Joyce did not report this alleged incident to anyone and is unsure if anyone else did.  (MJ Tr. 204).

193. The basis of Joyce's belief Osorio was subjected to sexual harassment are based on her discussions with Plaintiff Osorio.  (MJ 204, 205)

194. Plaintiff Joyce did not personally observe any purported telephone calls from Defendant Scott to Plaintiff Osorio regarding an Atlantic City trip or any alleged discussions regarding his sex life. (MJ Tr. 205).

195. With respect to Nafisa Saloon, Plaintiff Joyce alleges several men tried to converse with Ms. Saloon, including Antoine Clark, Stets Austin and Alvin Childs. (MJ 206, 207, 208, 209).

196. Plaintiff Joyce admits Ms. Saloon never told her the attention she was receiving was unwelcome, or made her uncomfortable, harassed or discriminated against. (MJ 207, 208, 209, 210).

197. Plaintiff Joyce further admits she never complained on Ms. Saloon's behalf regarding any of these purported incidents. (MJ Tr. 208, 210).

198. During all pertinent periods of time, Katie Schad and Julie Als never experienced or observed conduct which they believe was sexual harassment. (Affidavit of Julie Als; Affidavit of Katherine Schad).

199. Plaintiff Joyce alleges in October of 2004, Mr. Austin failed to appear for work. (MJ Tr. 214).

200. Plaintiff Joyce alleges she complained to Defendant Mays about Mr. Austin's absence, but never said Mr. Austin's conduct was based on gender discrimination, sexual harassment or in any way violated her rights. (MJ Tr. 223).

201. The only other person Plaintiff Joyce allegedly complained to in management about Mr. Austin was Christopher White, but again she did not tell Mr. White she felt she had been subjected to gender discrimination, sexual harassment or any violation of her rights. (MJ Tr. 241).

202. Joyce never had many dealings with Defendant Scott. (MJ Tr. 258).

203.    However Plaintiff alleges Defendant Scott yelled and screamed at her over the telephone, but did not curse, on one purported occasion in the Summer of 2004. (MJ Tr. 258).

204.    In 2003, during the Joyce was a Source employee, severe problems arose during the Source Awards viewing party while Plaintiff Joyce was an employee. (DM Tr. 201, 203).

205.    The viewing party was attended by Source clients and significant advertisers who could not watch the program because the large screen televisions and audio were inoperable. (DM Tr. 201, 203).

206.    Defendant Mays subsequently met with Plaintiff Joyce to discuss how to avoid a similar occurrence in the in the future. (DM Tr. 204).

207.    However in 2004, the exact same problems arose and attendees could not watch the awards program at the viewing party. (DM Tr. 201, 203).

208.    Defendant Mays told Plaintiff Joyce she was responsible for the problems. (MJ Tr. 225, 256).

209.    Since 2001, Media and Magazine publishing companies including the Source experienced fiscal difficulties. (DM Tr. 69).

210.    As a result, the Source went through periods of cutbacks and restructuring to streamline the Company whenever possible. (DM Tr. 69).

211.    On or about January 5, 2005, Defendant Mays eliminated Plaintiff Joyce's position and terminated Plaintiff Joyce's employment as a result of her poor work performance, lack of effectiveness and the Source's fiscal difficulties. (DM Tr. 196, 197).

212.    Defendant Mays directed Julie Als to terminate Plaintiff Joyce. (JA Tr. 291-290).

213.   Following Plaintiff Joyce's termination her position has never been filled, and The

Source has not hired anyone to replace her.  (MJ Tr. 253; JA Tr. 298).

Respectfully submitted,

JACKSON LEWIS LLP
One North Broadway
White Plains, New York 10601
(914) 328-0404

By: _____
Scott T. Baken (SB 9631)
Matthew H. Woodard (MW 7177)

ATTORNEYS FOR DEFENDANTS
DAVID MAYS AND RAYMOND SCOTT

DATED:   July 20, 2006
White Plains, New York

24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACKSON LEWIS LLP
One North Broadway
White Plains, New York 10601
Attorneys of Record for Defendants
      Scott T. Baken, Esq. (SB 9631)

-----------------------------------------------------------

KIMBERLY OSORIO and MICHELLE JOYCE,

                              Plaintiffs,

           -against-

SOURCE ENTERPRISES, INC.;
DAVID MAYS, in his official and individual
Capacities; and RAYMOND SCOTT, also known
as "BENZINO," in his official and individual
capacities,

                              Defendants.

-----------------------------------------------------------

Civ. No.: 05 CV 10029 (JSR)

## CERTIFICATE OF SERVICE

      1.    On July 20, 2006 I caused a true and correct copy of the foregoing Defendants' Statement Of Undisputed Facts Pursuant To Local Rule 56.1 In Support Of Defendants' David Mays' and Raymond Scott's Motion For Summary Judgment to be served on Plaintiffs Kimberly Osorio and Michelle Joyce: (1) by placing said document in a properly addressed, postage prepaid envelope and mailing it by First Class United States Mail to Plaintiffs' counsel of record Kenneth P. Thompson, Esq., at Mr. Thompson's office of record, Thompson Wigdor & Gilly LLP, located at 350 Fifth Avenue, Suite 5720, New York, New York 10118; and (2) electronically through the Electronic Case Filing system of the United States District Court for the Southern District of New York.

2.      On July 20, 2006, I caused a true and correct copy of the foregoing Defendants' Statement Of Undisputed Facts Pursuant To Local Rule 56.1 In Support Of Defendants' David Mays' and Raymond Scott's Motion For Summary Judgment to be served on Defendants Source Enterprises, Inc. and Source Entertainment, Inc.: (1) by placing said document in a properly addressed, postage prepaid envelope and mailing it by First Class United States Mail to Mercedes Colwin, Esq., counsel of record for Defendants Source Enterprises, Inc. and Source Entertainment, Inc., at Ms. Colwin's office of record, Gordon & Rees, LLP, located at One Liberty Plaza, 23rd Floor, New York, New York  10006; and (2) electronically through the Electronic Case Filing system of the United States District Court for the Southern District of New York.

_____
Matthew H. Woodard